## THE FARMERS' BANK v. ALEXANDER ROBESON'S ADMINISTRATORS.

High Court of Errors and Appeals. October 19, 1821.

*Ridgely's Notebook III, 512.*

*Black* for plaintiff. *McLane* for defendant.

This cause was heard by RIDGELY, CHANCELLOR, WARNER, WAY and COOPER, Justices of the Court of Common Pleas.

The following is the statement of the case. This was an action brought in the Supreme Court to November Term, 1818, by the President, Directors and Company of the Farmers' Bank of the State of Delaware against Elizabeth L. Robeson and Aaron Poulson, administrators of Alexander Robeson, deceased, on two promissory notes drawn by Mordecai McKinney, one dated September 6, 1812, for $1100, payable to Alexander Robeson sixty days after date; the other dated October 21, 1812, for $1400, payable to said Alexander Robeson sixty days after date, both of which were indorsed by Robeson. The note dated September 16, 1812, was protested for nonpayment on November 18, 1812, and the other on December 23, 1812; and written notices to Robeson, the indorser, were set up in a public part of the banking room at New Castle, where they were to be paid, on the respective days of protest, informing him of the demand, nonpayment and protest of the said notes respectively.

M. McKinney was a director of the Farmers' Bank at the times these notes were protested. On November 18, 1812, McKinney executed to the Bank a bond for $5000, conditioned for the payment of $2500, the amount of the two notes, on or before the expiration of 168 days after the day of the above date, with a warrant of attorney to confess judgment thereon, with a stay of execution until the day of payment. The following agreement signed by Mordecai McKinney and James Coupier, Jr., cashier of the Bank, was indorsed on the bond:

> "The within bond is taken as an additional and collateral security for the payment of two several promissory notes; one whereof was given by Mordecai McKinney on September 16, 1812, to Alexander Robeson, payable to him on order sixty days after date; and the other given by the same to

the same the 21st of October in the same year, payable to him or his order sixty days after date, endorsed by the said A. Robeson and discounted respectively at the Farmers' Bank at New Castle. And it is expressly understood and agreed that the taking this bond is not to be deemed a satisfaction or discharge of the said notes, or as releasing the indorser from his indorsement."

The following other indorsements were made on the bond by James Coupier, the cashier, "May 5, 1813, continued for 168 days; October 23, continued for 168 days,—April 12."

Alexander Robeson died in November, 1812.

Doctor Coupier, cashier of the Bank, was sworn as a witness in the cause. He proved the bank book of McKinney kept by him with the Bank, and that the entries therein were made by him, Coupier, and David Porter, a teller in the Bank. He also said that about the time the first note grew due an arrangement was made between McKinney and the directors of the Bank that both notes should be protested on their arriving at maturity, and that McKinney should give his bond with a warrant of attorney annexed for the amount of the two notes, as an additional and collateral security therefor; that he should pay the interest of the notes on the amount of the notes every sixty days as if they had not been protested, and that the credit of McKinney in [the] Bank should not be affected by the protests so to be made; and that it was his impression that this arrangement was proposed in consequence of the death of Robeson. He then proved the bond and indorsement thereon as before mentioned, and that after this arrangement was made, he, the witness, and the teller of the bank, for the purpose of keeping the business in its proper place, under their view, and to get the interest on the two notes regularly, entered the bond as discounted, although it was not discounted by the Board of Directors. That the interest on the notes from their protest to February 25, 1815, was paid by McKinney according to the arrangement. He further said that the bond was not discounted by the Board of Directors, nor was it intended to be, or received in payment of the notes. McKinney had considerable dealing in the Bank after these notes became due, and had there funds more than sufficient to pay them. He finally fell in debt in a large sum of money, exclusive of these notes, which they unsuccessfully attempted to secure upon his real estate in Pennsylvania. This bond was proceeded on, and the proceeds of his personal property were applied to the payment of these notes, and also other money arising on the sale of his real estate in Pennsylvania; still there is a con-

siderable balance of this claim unsatisfied, to recover which this suit was brought.

The Court gave in charge to the jury that the legal operation of the arrangement made by the directors of the Bank and Mc-Kinney was to discharge Robeson from any liability on these notes. A bill of exceptions was taken to the opinion of the court.

Verdict and judgment for the defendants.[1]

PER CURIAM. The effect of this arrangement between the Bank and McKinney was to give McKinney a credit of 168 days beyond the time of payment of these notes. Why were the notes protested and the bond taken for their amount? The answer is, to supersede the necessity of payment or of renewing the notes with a new indorser. Robeson's death gave rise to the transaction. The bond was a substitute for an indorser. McKinney paid the interest on these notes every sixty days, from their protest in November and December, 1812, to February 25, 1815, according to the arrangement. It is evident that this arrangement was the cause of the credit given. It was further agreed that the credit of McKinney in the Bank should not be affected by the protest, and it was not. The protests were merely formal, and were not designed to be enforced against McKinney.

Why were these protests made, the bond taken with a credit of 168 days, and agreement made to pay the interest every sixty days, and the interest actually paid for fourteen or fifteen months, if it was not the clear intention of the parties that Mc-Kinney should have time given at least for 168 days? After this arrangement they could not have put the notes in suit until the expiration of 168 days, he paying the interest. This is the plain import of the agreement. Here then, without the consent of the indorser, time was given to McKinney; and however the bond may have [been] considered as a collateral security, it is manifest that it was acted on as the principal and only security. It does not appear when proceedings were had on this bond, but certainly not until after February 25, 1815, the time of the last payment of interest. Be that though as it may, it superseded all proceedings against McKinney on the notes and against the representatives of Robeson, until this suit was commenced.

By giving time, the Bank took on itself all responsibility, and discharged the indorser. It was idle to declare in the indorsement on the bond that the taking the bond should not release

---

[1] At this point, *Ridgely's Notebook III, 516,* the account of this case is interrupted; it is resumed at *537.*

the indorser. Nothing but a reservation of the remedy against him, with his consent or the consent of his representatives, if he were then dead, could continue his liability. This we think is a stronger case than *Hedges against The Farmers' Bank.*

Judgment affirmed.

---

NOTE (made April 2, 1822, on reading the case, *Ex parte Gifford,* 6 Ves.Jr. 805). Although the consent of the indorser was not had to the agreement indorsed on the bond, yet, did not the reservation of the remedy against the indorser amount to an agreement of McKinney that Robeson might still pay the money and then proceed against him? Was it not the consent of McKinney that he should be liable to Robeson if he paid the money? In short, were not all remedies reserved to all parties by this agreement?

(April 3, 1822.) Though the decision is right, I fear that the reasoning of the Court is not perfectly correct. After the death of Robeson, the indorser, his administrators could not pay the debt unless the Bank proved it; and the continuation of the credit at two several times for 168 days each, gave time far beyond the original agreement, and there was no reservation of the remedy against the indorser for these periods. Besides, his death ought to have closed the business, as his administrators could not pay without probate and some act of the Bank. The death alone of the indorser without the actual consent of his administrators, I think, forbade any enlargement of the time, for they were bound to settle his estate in one year, and ought not by implication to be made parties to a new agreement. Still, according to the doctrine in 6 Ves.Jr., if they had paid the money I do not see but that they could have proceeded against McKinney; for his reservation of the remedy reserved their remedy against him. But the Bank must first have moved by making probate.